| | |
|---|---|
| KRISTIN BORG, JOHN DENNING IV, KATHERINE COLLAROS, AND JEANNIE RICH, <br><br> Plaintiffs, <br><br> v. <br><br> CHARLES D. WARREN, JR., JACOB M. DUDEK-WARREN, BORDEAUX FARMS, LLC., CHARITABLE OCCASION, LLC., AND MARIANNE WARREN, <br><br> Defendants. | : <br> : <br> : <br> : <br> : <br> : <br> : <br> : Case No. _____ <br> : <br> : <br> : <br> : <br> : <br> : <br> : |

## COMPLAINT

Plaintiffs, by counsel, bring this Complaint for violations of federal statutes, state statutes, and state common law, and state as follows:

## INTRODUCTION

1.      Ten years ago, Defendant Charles D. Warren, Jr. (who is also known as Dan Warren and is referred to below as "Dan Warren" or "Warren") launched Service Dogs by Warren Retrievers, Inc. ("SDWR") under the guise of providing service dogs to families around the country—but in reality with the goal of fleecing consumers for millions of dollars.

2.      Prior to launching SDWR, Warren had operated similar businesses, which brought him into contact with vulnerable families who were in need of service dogs, or who had service dogs, and he saw an opportunity to exploit those types of families.

3.      Warren developed a scheme to defraud vulnerable consumers into paying him tens of thousands of dollars for purportedly highly trained service dogs—primarily as purported autism

therapy dogs and diabetic alert dogs—however, in reality Warren and his co-conspirators only provided the vast majority of those families with nothing more than an ordinary dog (sometimes of advanced age) that was barely capable of following basic commands and was not cut out to be a service dog.

4.     Warren recruited his then boyfriend, and now husband, Jacob Dudek-Warren ("Dudek"), to help him set up and run the business and perpetrate the fraud scheme.

5.     Warren ensured that SDWR was structured such that Dudek as vice-president, and he, as president and chairman of the board of directors, could never be removed.

6.     Warren also formed single-member shell companies to help him launder money defrauded consumers paid to SDWR and transfer it through those shell entities to himself, and to Dudek. Warren transferred ownership of the 158-acre farm where he ran his SDWR operations to one of those shell entities, Bordeaux Farms, LLC, and then leased the land back to SDWR for exorbitant rent—funds which eventually made it back into Warren's, Dudek's, and Warren's mother's bank accounts.

7.     Dudek took charge of managing the livestock and caring for the dogs housed on the farm.

8.     And, as the business and the scheme grew, Dan Warren brought in his mother, Marianne Warren ("Ms. Warren") to help fund and expand the business. Despite knowing SDWR was a scam, Ms. Warren knowingly provided hundreds of thousands of dollars in funding to help the business grow in exchange for a return on that investment.

9.     In addition, to give the fraud scheme the appearance of legitimacy, Warren singled out a small percentage of families who were able to pay the five-figure purchase price (on average about $25,000.00) for a service dog all in one lump sum and ensured they were provided with

highly trained dogs, (the "High Value Families"); Warren did this so that the High Value Families would be more willing to provide positive testimonials and serve as "chapter" representatives. Warren used these High Value Families, who, based on their *personal* experience had no reason to know Warren and his co-conspirators were running a scam to defraud other families.

10. For nearly a decade, Warren and his co-conspirators succeeding in defrauding hundreds of families and lining their own pockets with millions of dollars.

11. During that time, Warren paid himself and Dudek unreasonable salaries from SDWR's coffers, collected above-market rent from SDWR (using money generated from the fraud-scheme) through Bordeaux Farms, hid SDWR profits in bank accounts owned by his shell entities, paid Ms. Warren a profit for her investment in the scam, and co-mingled and used SDWR funds to fund his and Dudek's own lavish lifestyle.

12. In 2018, Warren became mired in an investigation and subsequent prosecution by the Attorney General's Office for the Commonwealth of Virginia.

13. By late 2019, Warren's and his co-conspirators' greed had depleted SDWR's finances to the point where the business was spiraling toward insolvency. Ms. Warren attempted to bail the business out in early 2020, but to no avail.

14. Anticipating the imminent collapse of the fraud scheme, and feeling the pressure from the attorney general's office, Warren enacted contingency plans he and Dudek had put in place years earlier to shut-down the business, sell off assets—including the 158-acre farm owned by Bordeaux Farms—and flee the Commonwealth.

15. Warren implemented "incentive" programs to provide a "discount" to families if they paid tens of thousands of dollars up front starting in late 2019 and continuing until March of 2020 to purchase a service dog—a dog which neither Warren nor his co-conspirators ever had any

intention of providing.  To get consumers to part with their money, Warren and Dudek personally misrepresented to consumers that they would be provided with a trained service dog even though they knew they had no such dogs and had no intention of providing such dogs.  Rather, they simply wanted to pull in as much cash as they could before shuttering the business, liquidating SDWR's assets, liquidating Bordeaux Farms' assets, and liquidating his other shell entities' assets.

16.     In addition, Warren and Dudek directed SDWR employees to sell off SDWR assets such as computers, vehicles, supplies, and other valuable equipment, and then transferred the money generated from those sales to their own bank accounts or to pay back Ms. Warren for her investment (including her last-minute bailout attempts).

17.     At this same time, beginning in March 2020, Warren and Dudek began traveling through Florida looking for new land to purchase so that, after shuttering SDWR, selling the farm, and fleeing Virginia with millions of dollars in ill-gotten gains, they could set up a new fraud scheme in Florida—far away from their troubles in Virginia.

18.     And, using the COVID-19 pandemic as an excuse for problems with delivery of dogs, Warren's mass sell-off of assets (including untrained dogs), culminated with consumers being encouraged to come pick up a dog at a road-side sale of whatever dogs remained in early April 2020.

19.     For any family that could not attend that event, Warren and Dudek sold the dog to someone else—provided that person could come to the road-side sale and pay cash for the dog.

20.     After that, Warren paid Ms. Warren part of her share of profits from her investment; he drained SDWR's bank accounts (transferring the money to himself, Dudek, Bordeaux Farms, or other shell entities); and he Dudek shuttered the business, laid off all employees, and listed the farm for sale for $1.5 million dollars—with plans to move their operations to Florida.

21.     In May 2020, SDWR filed for bankruptcy in the United States Bankruptcy Court for the Western District of Virginia claiming it had less than $100.00 in total assets.

22.     To this day, Warren and Dudek continue to sell off SDWR's assets (to enrich themselves), are attempting to sell the farm, and, together, they have spent substantial time in the last seven months traveling to Florida in search of new acreage to buy.

23.     This lawsuit, brought by four families defrauded by Warren and his co-conspirators, seeks to hold Warren and his co-conspirators liable for their fraud, breach of contract, conspiracy, violations of the federal Racketeer Influence and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.*, violations of the Virginia Consumer Protection Act ("VCPA"), Va. Code § 59.1-196 *et seq.,* violations of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 *et seq.* ("FDUTPA"), violations of California's Unfair Competition Law, Cal. Bus. And Prof. Code § 17200 *et seq.* ("UCL"), violations of the North Dakota Deceptive Trade Practice Law N.D.C.C. § 51-10-01 *et seq.* ("NDUTPL"), and violations of the Ohio Consumer Sales Practices Act O.R.C. § 1345.01 *et seq.* & O.A.C 109:4-3-01 *et seq.* ("OCSPA").

## JURISDICTION AND VENUE

24.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States, specifically, under the Racketeer Influence and Corrupt Organizations Act ("RICO"), 18, U.S.C. § 1961 *et seq.* This Court also has subject matter jurisdiction under 28 U.S.C § 1332(a) because the amount in controversy exceeds $75,000.00 (per plaintiff and in aggregate) and each plaintiff is not a citizen of the same state of each defendant.

25.     Venue is proper in this District under 28 U.S.C. §1391 because all defendants are residents of Virginia and multiple defendants reside in this District, including at least one that resides in this division.

## PARTIES

### Defendants

26.     Defendant Dan Warren is a resident of Madison County, Virginia and the President of Service Dogs by Warren Retrievers, Inc., ("SDWR") a Virginia 501(c)(3) Corporation.

27.     Dudek is married to Dan Warren and is a resident of Madison County, Virginia and the Vice-President of Service Dogs by Warren Retrievers, Inc.

28.     Defendant Bordeaux Farms, LLC ("Bordeaux Farms") is a single member Virginia Limited Liability Company owned by Warren, which conducts substantial business throughout this District and within the counties in this Division.

29.     Defendant Charitable Occasion, LLC ("Charitable Occasion") is a single member Virginia Limited Liability Company owned by Warren.

30.     Defendant Marianne Warren ("Ms. Warren") is a resident of Hanover County, Virginia.  She is Dan Warren's mother and has been involved with and funded his business activities—including those of non-party SDWR—for several years.

31.     Defendants, are referred to collectively throughout as the "Co-conspirators."

### Plaintiff Consumers

32.     Plaintiff Kristin Borg is a resident of Tampa, Florida.

33.     Kristin Borg is the mother of a 9-year-old special needs child with autism.  Mrs. Borg contracted with Dan Warren for a service dog for her child and paid tens of thousands of dollars for that dog, but never received a trained service dog or additional training for that dog to certify it as an autism therapy service dog.

34.     Plaintiff Jeannie Rich is a resident of Tracy, California.

35.     Jeannie Rich is the mother of a 11-year-old  special needs child with autism.  Ms.

Rich contracted with Dan Warren and SDWR for a service dog for her child, and paid $25,000.00 that dog, but never received a trained service dog or additional training for that dog to certify it as an autism therapy service dog.

36.     Plaintiff John Denning IV is a resident of Minot, North Dakota.

37.     Denning contracted with Dan Warren and Dudek for a diabetic alert service dog and paid tens of thousands of dollars for that dog, but never received a trained diabetic alert service dog or additional training for that dog to certify it as a diabetic alert service dog.

38.     Plaintiff Katherine Collaros is a resident of Maineville, Ohio.

39.     Katherine Collaros is the mother a 14-year-old diabetic child who contracted with Dan Warren for a diabetic alert dog, and paid tens of thousands of dollars for that dog, but never received a trained service dog or additional training for that dog to certify it as a diabetic alert service dog.

**FACTS**

**I.     Dan Warren Founds SDWR.**

40.     In October 2010 Dan Warren formed SDWR and incorporated it as a Virginia nonstock corporation and designated himself as the President of SDWR.

41.     Subsequently, Dan Warren applied for and (in April 2011) obtained tax-exempt status under Section 501(c)(3) of the United States Internal Revenue Code for SDWR.

42.     Dan Warren also made himself chairman of the SDWR Board of Directors and appointed Dudek as the Vice-President of SDWR.

**II.     Dan Warren Purchases a 158 Acre Farm and Conveys it to His Own Shell Entity and Then Uses Illicitly Obtained SDWR Funds to Pay Himself Above Market Rent.**

43.     In February 2011, Dan Warren formed Bordeaux Farms, LLC, which is a single member Virginia Limited Liability Company that Dan Warren uses to own real property.

44. In or around October 2011, Dan Warren purchased the real property located at 1543 Beahm Town Road 22701 in Madison County, VA (the "Farm Property" or the "Farm").

45. The Farm Property is approximately 158 acres.

46. On November 4, 2011, Dan Warren conveyed the Farm Property to Bordeaux Farms for no consideration in a less than arm's length transaction, as evidenced by a Deed dated November 4, 2011 and recorded in the land records of Madison County as Deed Number 110001531.

47. At the time Dan Warren purchased the Farm Property, he paid for part of the purchase price with a mortgage loan of approximately $650,000.00 (the "Mortgage").

48. In May 2012, Dan Warren formed Charitable Occasion, LLC, which is a single member Virginia Limited Liability Company that Dan Warren uses to own real property and hold funds laundered through SDWR and/or Bordeaux Farms, LLC.

49. Starting in 2012, Dan Warren used his power and total control over SDWR to enter it into an above market lease for the Farm Property and then used funds generated from SDWR's purportedly charitable (and tax exempt) activities to pay rent to Bordeaux Farms, which Dan was used to pay down the Mortgage on the Farm property.

50. In addition, upon information and belief, Dan Warren used SDWR funds to make hundreds of thousands of dollars' worth of improvements to the Farm Property and to fund his, Dudek's and their co-conspirator's fraud scheme.

51. However, Dan Warren wished to pay off the Mortgage faster.

52. So, he obtained hundreds of thousands of dollars from his mother, Ms. Warren, in 2016, which he then used to pay off the Mortgage.

53. Upon information and belief, Ms. Warren gave him that money because he agreed

to repay her (at a profit to her) with monies generated from the illicit activities he was engaged in through his operation of SDWR.

54.     Upon information and belief, Ms. Warren was aware at that time that SDWR was unlawfully defrauding families of tens of thousands of dollars, but agreed to provide the loan payoff funds anyway, knowingly accept her son's ill-gotten gains, and join in his conspiracy to defraud vulnerable families.

55.     At various times from at least 2016 to 2020 Ms. Warren provided additional funding to Dan Warren's and Dudek's fraud scheme with the expectation that she would make a profit when Dan Warren paid her back after defrauding consumers, such as the Plaintiffs.

III.    **Dan Warren and his Co-Conspirators Use Their Service Dog Operation to Prey on Vulnerable Families Such as the Plaintiffs.**

56.     According to SDWR's bylaws, Warren can only be removed from the board of directors or as "President" of the organization by unanimous vote of all other directors, and "on the basis of a material and intentional breach of fiduciary duty or willful wrongful action."

57.     Warren appointed Dudek as Vice-President and together the two of them managed the organization's day to day operations.

58.     Primarily, Dudek managed the care of animals and delivery to families and Warren worked directly with consumers and drafted and/or approved the contracts for purchase of all dogs from SDWR and purchase of any services from SDWR.

59.     The structure of the business permitted Warren and Dudek to have complete and total control over SDWR and use it as their alter-ego—with little to no oversight from the powerless board of directors.

**The Diabetic Alert Dog Fraud**

60.     In or around late 2011 or early 2012, Warren began promoting a supposed Diabetic

Alert Dog program in which he and/or Dudek represented to consumers that they would be provided with a specially trained dog with "proven scene ability," which would cause the dog to alert when detecting high or low blood sugar levels.

61. Similar to claims made on the SDWR website, Warren and Dudek made claims directly to consumers—including Denning and Collaros who purchased Diabetic Alert Dogs from Warren and Dudek—such as the following:

      a. That those families would be provided with a dog that had been "temperament tested" from a young age.

      b. That those families would be provided with a dog that had received special "scent" training to "achieve maximum alert and response ability."

      c. That the dogs training was somehow "backed by science."

62. None of these claims were true and Warren and Dudek knew they were not true at the time they made such claims to Denning and Collaros.

63. Indeed, Warren and Dudek had no evidence to support these claims at the time they made them to Denning and Collaros.

64. Yet Warren and Dudek repeatedly made all of these claims to families who reached out for a Diabetic Alert Dog—including Denning and Collaros who purchased Diabetic Alert Dogs from Warren—to induce those families to pay tens of thousands of dollars to him.

65. However, many of the dogs that were actually provided to consumers were not even house broken, some exhibited aggressive behaviors, and some could not follow basic commands.

66. In initial conversations with the Denning and Collaros families, Warren personally made many of the aforementioned representations to those respective families, and those two families never received any such trained dog. In fact, those families never received any dog at all, and Warren and Dudek never had any intention of providing them with one.

**The Autism Therapy Dog Fraud**

67.     In 2016, with the Mortgage on the Farm paid off and with additional funding from Ms. Warren, Dan Warren and his co-conspirators diversified their fraud scheme to begin targeting and scamming families with autistic children.

68.     Warren began promoting a supposed Autism Therapy Dog program in which he and/or Dudek represented to consumers that they would be provided with a dog that would be specially trained through a "proprietary training and placement program [that] ensures that every family with an Autism Dog finds the independence and safety they are looking for."

69.     Similar to claims made on the SDWR website, Warren and Dudek made claims directly to consumers—including Borg and Rich, who purchased Autism Therapy Dogs from Warren and Dudek—such as the following:

    a.      That they "breed and acquire  only the highest quality of dogs suitable for Autism care" and therefore families could "trust" in their "investment."

    b.      That their training is somehow "unsurpassed" and would allow families with autistic children to "better manage living and caring for spectrum disorder."

    c.      That their dogs would be trained to, among other things:

        i.      Help in "finding lost child."

        ii.     Help in "redirection from self-harm."

        iii.    "Help with Sensory Processing Disorder."

70.     None of these claims were true and Warren and Dudek knew they were not true at the time they made such claims to Borg and Rich.

71.     Indeed, Warren and Dudek had no evidence to support these claims at the time they made them to Borg and Rich.

72.     These representations were also made with the willful and total disregard of how

dangerous it would be for a family to rely on these representations, all of which make promises regarding the Autism Therapy Dog's ability to help keep a special needs child safe from harm.

73.     Warren and Dudek repeatedly made all of these claims to families who reached out for an Autism therapy dogs—including Borg and Rich, who purchased Autism therapy Dogs from Warren—to induce those families to pay tens of thousands of dollars to him.

74.     However, many of the dogs that were actually provided to consumers were not even house broken, some exhibited aggressive behaviors, and some could not follow basic commands.

75.     In initial conversations with the Borg and Rich families, Warren personally made many of the aforementioned representations to those respective families, and those two families never received any such trained dog.  In fact, those families never received any dog at all, and Warren and Dudek never had any intention of providing them with one.

## IV.     In Late 2019, with Their Fraud Scheme Beginning to Financially Unravel, Warren and Dudek Prepare to Shut Down the Scheme and Skip Town with Millions of Dollars.

76.     Over the past decade, Dan Warren told multiple employees that he had contingency plans in place to shutter the SDWR business, sell as many assets as possible, and leave town—in the "middle of the night" if necessary.

77.     Warren told his employees they must be ready to wind things down on a moment's notice and that "when I say go, we go."

78.     In or around December 2019, Warren put that plan into action.  He and Dudek began listing SDWR's personal property for sale, and to the extent any of it has been sold, the proceeds from those sales have gone to Dudek and Warren's personal bank accounts, to Ms. Warren, and/or to unknown bank accounts of Bordeaux Farms/Charitable Occasion.

79.     At about that same time, Warren also devised scheme to dupe consumers who had

contract for a Service Dog to induce them to accelerate their payments and pay as much as possible in the short term in exchange for "matching grants."

80.     And, in March 2020, Warren devised a scheme to convince families who had at least partially paid the $25,000.00 purchase price for a therapy dog to come to a roadside dog pick-up on April 9, 2020—which he called a "bonding event"—in an effort to dispose of as many dogs as he possibly could.

81.     Warren transferred money and other assets to his mother, Ms. Warren, to himself, to Dudek and/or to one of his LLCs named in this lawsuit.

82.     In addition, upon information and belief, starting in or around March 2020, Warren transferred a substantial amount of property—including vehicles, veterinary supplies, dog food, and other equipment—to at least one of his employees, Cheri Campbell, with the understanding that she would hold that property until after he was able to set up a new operation in Florida and recover those valuable assets.

83.     At around this same time (Spring 2020), the Farm Property was listed for sale for $1.5 million in an effort to liquidate that asset.

## V.     Warren and Dudek Travel to Florida in a Fancy RV to Search for Property to Buy and Set Up a New Operation Outside the Commonwealth of Virginia.

84.     In March 2020, using COVID-19 as an excuse, Warren and Dudek travelled to Florida for an extended vacation (at a time when SDWR was failing and winding down) to search for new property to buy with the proceeds from the sale of the Farm and other assets.

85.     They traveled in a motorhome worth hundreds of thousands of dollars, which Warren had purchased years earlier using funds he had skimmed from SDWR's coffers.

86.     That trip lasted several months (except for a brief return to Virginia in early April 2020), and the purpose of the trip was to locate a property with sufficient acreage to establish a

new service dog training program and start a new scam in a different state after winding down SDWR.

87.     In fact, during the trip, Warren and Dudek visited at least one vendor to pick up service dog vests in *June* 2020 *after* SDWR had filed bankruptcy.

88.     They plan to use  the vests as part of the new operation they were, and, upon information and belief, still are planning to establish in Florida.

## VI.     Dan Warren and his Co-conspirators Transfer SDWR's Assets to Themselves and Sell-off The Remaining Dogs on the Side of the Road.

89.     In the middle of their trip to Florida, Warren and Dudek returned to the Farm briefly in early April to attend the "bonding event" and to sell as many remaining SDWR dogs as possible to any families they had contracts with who showed up at the April 8, 2020 event—or to anyone else who would buy the dogs (at whatever price they could charge).

90.     Dudek and Warren participated directly in the sale of the dogs and retained all of the proceeds from those sales.

91.     Subsequently, they transferred all of SDWR's remaining assets and money to themselves, to Ms. Warren, and, upon information and belief, unknown bank accounts held by Bordeaux Farms and Charitable Occasion.[1]

## VII.     After Virtually all SDWR Assets are Liquidated, SDWR Files for Bankruptcy.

92.     On May 29, 2020, at Dan Warren's direction, SDWR filed for Chapter 7 Bankruptcy in the United States Bankruptcy Court for the Western District of Virginia, Case No. 20-60860 (the "SDWR Bankruptcy").

93.     In the Chapter 7 Schedules, which Warren executed on behalf of SDWR (and under

---

[1] While Dan Warren testified at the 341 Creditor's Meeting for the SDWR Bankruptcy that Bordeaux Farms had no bank accounts of its own, the veracity of that testimony has yet to be tested and investigation is ongoing.

penalty of perjury), SDWR lists its total assets as $73.58—despite having generated millions of dollars in revenue over the past few years. *See* SDWR Bankruptcy ECF No. 19.

94.     At the 341 Creditor's Meeting in the SDWR Bankruptcy, Warren testified under oath as to, among other things, the following:

      a.     Warren and Dudek were the only two officers at SDWR.

      b.     Ms. Warren had a "vested interest" in his business dealings at SDWR.

      c.     Most recently, Ms. Warren invested $25,000 to $50,000 in multiple payments in early 2020 to try to keep the business running.

      d.     SDWR began having problems in late 2019 and early 2020 (a time when Warren and Dudek were still personally promising to deliver trained service dogs to consumers and soliciting them for tens of thousands of dollars to purchase dogs that they have no intention of delivering).

      e.     Warren and Dudek began liquidating SDWR's assets in late 2019.

      f.     Warren paid off the mortgage on the Farm using money Ms. Warren gave him in 2016.

      g.     Bordeaux Farms (which is totally controlled by Warren) owns the Farm free and clear of any encumbrances.

      h.     Warren and Dudek received hundreds of thousands of dollars per year (at varying rates) in salary from SDWR.

      i.     Bordeaux Farms has no separate bank accounts and any money paid to Bordeaux Farms was deposited in Warren's or Dudek's personal bank accounts.

      j.     At Warren's direction, SDWR paid over $100,000/year in rent to Bordeaux Farms (money that eventually went into Warren's personal bank accounts).

      k.     Despite personally representing to consumers that there was "grant money" being used to give discounts to consumers in late 2019 and early 2020—including one of the SDWR families—in reality Warren was just providing credits to incentive families to purchase dogs more quickly.

      l.     Warren was previously convicted of a felony for forging a financial document in 2007.

**VIII. Plaintiffs Were Misled into Purchasing Service Dogs and Defrauded Out of Tens of Thousands of Dollars Each.**

95.     Plaintiffs were defrauded out of tens of thousands of dollars over the course of the past couple of years.

96.     None of them ever received a fully trained service dog.

**The Borg Family**

97.     In early 2019, the Borg family began researching whether it would be possible to obtain a therapy dog for their autistic child and came across Warren's and Dudek's website.

98.     At that time, Dan Warren presented SDWR as an organization sympathetic to the Borg family's plight and dedicated to providing service dogs to children with autism "until there's a cure"—but in reality, this was all a ruse engineered by Warren and Dudek.

99.     However, Mrs. Borg had no way of knowing about these deceptions.

100.    Warren contacted her directly and handled nearly all communications with her.

101.    This was a particularly stressful and vulnerable time for Mrs. Borg because her husband was deployed abroad in Afghanistan while she stayed home to care for their children.

102.    Over the course of several weeks, Warren made dozens of misrepresentations to Mrs. Borg in writing, on the phone, and in a binding contract to induce her to purchase an autism service dog from SDWR for $25,000.00.

103.    For example, on or about May 16, 2019 Warren represented to Mrs. Borg both orally and in writing that:

> a.      He would "sell and convey" an autism "Service Dog" to her for "$25,000.00" and that the full amount must be paid "prior to placement of said Service Dog."
>
> b.      His "unique service dog program is unmatched."

c. The program provides autism therapy dogs "with countless hours of training before they arrive to your home environment."

d. The Borgs would be provided with a "customized training program" for their service dog.

e. The Borgs would be provided with "training of the Service dog for use as a…Autism Service Dog…through SDWR's trainers."

f. After placement, the Borgs would receive additional follow-up training to include "approximately One Hundred Forty to One Hundred Eight (140 – 180) hours of training…including in-home visits.[2]"

g. The dog they were purchasing had been "at the time of sale" been evaluated and "been determined…to be structurally and temperamentally suited to be a…Autism Service Dog…."

104. Warren knew the aforementioned misrepresentations were untrue when he made them and that there was no basis in fact for any of these misrepresentations.

105. Based on Warren's misleading charm and representations, on May 16, 2019, Mrs. Borg entered into a contract to purchase Service Dog to help her autistic child for $25,000.00.

106. In addition, Mrs. Borg relied on the misleading testimonials Warren and Dudek placed on the SDWR website from High Value Families to deliberately mislead consumers, like Mrs. Borg, into believing all families were treated the same as the High Value Families—when in fact they were not, and when in fact Warren and Dudek were using the High Value Families to provide a false sense that his organization was legitimate and not a scam.

107. After Mrs. Borg entered into the contract to purchase a therapy dog, and in an effort to induce Mrs. Borg to continue making payments toward the full purchase price, in several communications between May 2019 and December 2019, Warren and Dudek—and employees acting at their direction—reaffirmed these misrepresentations even though they knew by late 2019

---

[2] Warren also represented that only $8,000.00 of the purchase price for the service dog applied toward these additional trainings and that SDWR would "bill" the Borgs for "any and all overnight stays" in excess of that amount.

their business was heading toward bankruptcy and would not be able to provide Mrs. Borg with a dog, let alone a suitable autism services dog.

108. In addition, at or about the time Mrs. Borg entered into a contract to purchase that dog, Warren provided SDWR "guidelines" and "FAQ" documents to Mrs. Borg—guidelines that she was required to execute—which explicitly stated that the entirety of the purchase price had to be paid through a third-party called "Donor Drive"

109. Warren (both directly and through employees acting at his direction) told Ms. Borg that the funds to purchase her son's autism therapy dog had to be submitted through Donor Drive— which is a third-party vendor that facilitates charitable donations—because "SDWR is a 501(c)(3)."

110. At Warren's direction, and pursuant to the contract he presented her with, Mrs. Borg set up a Donor Drive account in June 2019 through which funds could be deposited to pay for a Service Dog for her son.

111. However, SDWR (and by extension Warren and Dudek) completely controlled the funds submitted to that Donor Drive account because Warren ensured that an SDWR employee "helped" set up the account and that he maintained primary access to that account.

112. In addition, under his arrangement with Donor Drive, Warren ensured that at the end of every business day, the funds deposited into the Donor Drive account (and the Donor Drive account of all Plaintiffs) was automatically wired to SDWR bank accounts in Virginia—which he and Dudek had exclusive control over.

113. Between June 2019 and December 2019, Mrs. Borg wired dozens of deposits from her bank account in Florida to the Donor Drive bank account in Ohio.

114. At the end of every business day where there was a balance in that account, those

funds were then automatically wired to bank accounts controlled by Warren and Dudek in Virginia.

115. Once the funds were in those bank accounts Warren and/or Dudek would (among other things) and from time to time:

      a. Transfer the funds to Bordeaux Farms, LLC bank accounts or Warren's own personal bank accounts which Warren completely controlled.

      b. Transfer the funds to Charitable Occasion, LLC's bank accounts which Warren completely controlled.

      c. Transfer the funds to transfer it to their personal accounts.

      d. Use the funds to pay for personal expenses.

      e. Transfer the funds to Ms. Warren repay Ms. Warren for her investment in the fraud scheme and/or use it to fund further fund their fraud scheme.

116. By December 2019 the Borg family had met the $25,000.00 threshold[3] and Warren informed them they could expect to receive a *fully trained dog* within 5-7 months.

117. The Borgs sent Warren a t-shirt as a thank you, and on January 7, 2020 they received an email from him acknowledging the gift and reassuring them everything was on track.

118. For the next couple of months, the Borgs heard nothing from Warren or anyone else at SDWR, but did not expect to hear anything based on the timeline they were presented with.

119. Peculiarly, on March 24, 2020 the Borgs received an email about a bonding opportunity on April 8, 2020—provided they could travel to the Farm in Virginia on that day— but were also told they were *not* guaranteed to *keep* whatever dog they were provided with.

120. The Borgs were not interested in the dog bonding opportunity because of the challenges inherent in having their son bond with a dog and the dangerous possibility of that dog being ripped away from him even if he did eventually bond with the dog.

121. At this point, the Borgs became concerned that Warren had deceived them and

---

[3] Due to accounting delays/errors they actually paid $25,450.00

might possibly be running a scam because, among other things, anyone familiar with autistic children and/or autism therapy dogs would never suggest providing an autistic child with a dog to "bond" with despite the possibility that dog would then be taken away.

122.  Prior to that time, the Borgs had no reason to believe Warren or any of his co-conspirators were running a scam or deceiving them.

123.  To date, the Borg's have not received the autism therapy dog that they purchased, and Warren has refused to return their money.

124.  At the time Dudek and Warren made all of the aforementioned representations to Mrs. Borg, they had no intention of ever providing her with a fully trained service dog.  They just wanted her money.

### The Rich Family

125.  Beginning in 2019, Ms. Rich began searching for a service dog for her autistic daughter.  However, most organizations she came across indicated it could take 1-2 years *at least* for her to obtain a service dog.

126.  Then, shortly before Christmas in 2019, her daughter began asking for service dog, and her daughter was disappointed when no dog arrived under the tree that year.

127.  So, right after Christmas, Ms. Rich started researching in earnest.

128.  At that time, she came across Dan Warren's SDWR website.

129.  She was immediately impressed by Warren's and Dudek's promise on that website of it taking merely 6-12 months to get dog, following full payment for the dog.

130.  Ms. Rich knew she could get the $25,000.00 from her daughter's Special Needs Trust[4] right away, without having to wait longer and make payments over time.

---

[4] Her daughter has a trust fund because her father (who suffered from mental illness), was beaten to death by Sheriff Deputies while in custody in 2015, which led to a settlement and the special needs trust being established.

131.     Ms. Rich contacted SDWR and spoke to Dudek and Warren about their autism service dogs and what to expect in terms of training and delivery time frames.

132.     Early on in their discussions Ms. Rich told Dudek and Warren she could get the $25,000.00 from her daughter's trust within weeks.

133.     Dudek and Warren—desperate for cash—immediately began making promises of how well she would be taken care and how they could accelerate the delivery timeline.

134.     Dudek and Warren told her to go on their Facebook page

135.     Ms. Rich reviewed that page and the SDWR website each of which contained dozens of purported testimonials of satisfied customers—which Dudek and Warren had put there to mislead consumers, including Ms. Rich.

136.     Ms. Rich also relied on promotional videos and other information on the website.

137.     In her conversations with Warren and Dudek, Ms. Rich made clear that she needed a hypo allergenic dog for her autistic daughter because Ms. Rich's son has allergies.

138.     They promised her she would receive a hypo allergenic dog named "Abbot."

139.     Warren told her orally and in writing that she could go look up "Abbot" on his website.

140.     He and Dudek represented that would be the dog she would receive and made clear that "Abbot" would be a "fully trained upon arrival."

141.     And, they promised that she would receive additional training after delivery to further tailor the dog to her daughter's needs within 5 days after delivery and then on a quarterly basis after that.  .

142.     Satisfied that Warren and Dudek could deliver a high-quality service dog, based on their representations, Ms. Rich filled out the application and submitted it.

143.   Given that Ms. Rich was promising to pay $25,000.00 up front, Warren and Dudek ensured Ms. Rich's application was accepted almost instantaneously.

144.   She executed the contract to purchase "Abbot," requested that full payment be made from her daughter's Special Needs Trust in California, and payment was made as follows:

      a.    In late January 2020 funds were withdrawn from the pooled trust's bank account in Pennsylvania.

      b.    A check was drafted by the trust company located in California.

      c.    The check for $25,000.00 was sent from the trust's principal place of business in California, to Warren in Virginia in late January 2020.

145.   After that, Ms. Rich was told she would get a delivery date within a few months.

146.   On March 16, 2020, Ms. Rich received an email that all deliveries were being halted due to the COVID-19 pandemic and inviting her to an April 2020 "bonding event" at the Farm.

147.   She immediately responded and explained she could not travel from California to Virginia during a pandemic and demanded the dog be shipped to her.

148.   In response either Dan Warren or an employee acting at his direction, told her that COVID-19 was somehow preventing them from shipping "Abbot" to her.

149.   Nonetheless, they reaffirmed that a fully trained dog would be made available to her if she came to the "bonding event" and, in subsequent communications repeatedly used COVID-19 as an excuse for why they could not deliver a service dog as promised.

150.   After Ms. Rich declined to come to the "bonding event" there was no further communication from Warren, Dudek, or anyone else at SDWR.

151.   In June 2020, Ms. Rich received notice of SDWR's bankruptcy and that is the first time she learned it was insolvent.

152.   Ms. Rich never received a fully trained autism therapy dog for her daughter.

153.    In addition, at the time Dudek and Warren made all of the aforementioned representations they had no intention of ever providing Ms. Rich with a fully trained service dog. They just wanted her money.

**The Denning Family**

154.    In the Fall of 2019, the Denning family began searching for a diabetic alert dog for John Denning.

155.    John works in the construction industry in oil fields in North Dakota.

156.    He had previously had issues with his diabetes while on the job, which resulted in multiple hospitalizations.

157.    Rather than quit his job or go on workman's compensation, John (with his family's help and support) sought out a diabetic alert service dog would help him continue to work.

158.    John's mother and sister helped him in that search, and the family eventually came across Warren's and Dudek's website.

159.    They contacted Dan Warren.

160.    From the outset, Warren presented a very successful overall representation of what his organization had done for families in search of diabetic alert dogs—none of that turned out to be true.

161.    John Dan Warren that he needed dog to function out in oil field construction sites where there would be loud noises and other distractions.

162.    Warren represented to John that the diabetic alert dog that he would provide to John (if John paid him $25,000.00) would receive special training and would be fully trained to alert to blood sugar levels—however Warren knew none of this was true at the time he made these demonstrably false representations to John.

163.     Warren represented to John that any dog provided to John would be trained to fit John's specific needs and that Warren's trainers would use proprietary methods to customize training to suit John's needs—such as being able to function at a loud construction site around multiple distractions.

164.     In addition to Warren's representations, John relied testimonials on SDWR's website.  He watched videos and read the written testimonials—all of which Dan Warren and/or Dudek intentionally placed there to present a misleading representation of their scam operation.

165.     As a result, in or around early December 2019 (when SDWR was already insolvent), John entered into a contract for $25,000.00 with Dan Warren to purchase a diabetic alert dog from SDWR.

166.     John (with some help from his family) mailed an initial deposit check for $5,000.00 from their home in North Dakota to Dan Warren in Virginia.

167.     At approximately that same time, Dan Warren told John and his family that they *had to use* Donor Drive to submit payments under the contract because SDWR is non-profit.

168.     Subsequently, between December 2019 and March 2020, John, with his family's help, wired money from their bank accounts in North Dakota to a Donor Drive account in Ohio.

169.     At the end of every business day where there was a balance in that account, those funds were then automatically wired to bank accounts controlled by Warren and Dudek in Virginia.

170.     Once the funds were in those bank accounts Warren and/or Dudek would (among other things) and from time to time:

    a.     Transfer the funds to Bordeaux Farms, LLC bank accounts or Warren's own personal bank accounts which Warren completely controlled.

    b.     Transfer the funds to Charitable Occasion, LLC's bank accounts which Warren completely controlled.

c.      Transfer the funds to transfer it to their personal accounts.

d.      Use the funds to pay for personal expenses.

e.      Transfer the funds to Ms. Warren repay Ms. Warren for her investment in the fraud scheme  and/or use it to fund further fund their fraud scheme.

171.    From December 2019 through March 2020, at Warren's or Dudek's direction, John Denning received multiple email communications encouraging him to keep paying toward the purchase price his diabetic alert dog.

172.    At no time during those communications did Warren, Dudek, or any employee acting at their direction (or otherwise), alert Denning that SDWR was insolvent and that there was no chance John would receive a therapy dog—despite the thousands of dollars he was being encouraged to pay.

173.    John Denning paid a total of $16,000.00 before he learned, in late May 2020—shortly before SDWR filed for bankruptcy—that Dan Warren, Dudek, and their co-conspirators were running a scam.

174.    Roughly one week before SDWR filed for bankruptcy, John went on to the Donor Drive website to look at his account and discovered it was gone (along with all of the money)—presumably because Warren/Dudek had it removed.

175.    Denning never received a diabetic alert dog and Warren/Dudek have refused to return his money.

176.    At the time Dudek and Warren made all of the aforementioned representations to Denning, they had no intention of ever providing Denning with a  fully trained service dog.  They just wanted his money.

**The Collaros Family**

177.    Starting in 2017, the Ms. Collaros' child began having increasing issues with low

blood sugar levels at night.

178.    At that time, the Collaros family began researching options to allow them to better monitor their child's blood sugar levels without having to constantly test those levels.

179.    Ms. Collaros Googled diabetic alert dogs and discovered Dan Warren's website and reached out to SDWR shortly after that.

180.    Dan Warren called her directly in early March 2018.

181.    On the phone, Dan Warren made several promises to Ms. Collaros regarding his diabetic alert dogs, including, but not limited to: (1) that dog she would receive would be specially trained *before* being sent to the Collaros; (2) that the dog would receive "proprietary training" methods that would enable  the dog  "to get medical assistance such as by calling 911" by "pushing a special button;" and (3) that the dog would automatically alert to blood sugar levels—including, if necessary, arousing the Collaros at night if their child's blood sugar levels dropped.

182.    Dan Warren personally handled all initial oral and written communications with Ms. Collaros and her family.

183.    He represented to Ms. Collaros that she could pay for the dog over time, but that delivery of a *fully trained* service dog would not occur until she paid the full $25,000.00 purchase price.

184.    Ms. Collaros, at Dan Warren's urging, also went on the  SDWR website to review online testimonials, which Dudek and Warren had put there to mislead consumers such as Ms. Collaros.

185.    Dan Warren had a contract for the purchase of a diabetic alert dog (and related documents) sent to Collaros—which contained many of the same aforementioned representations regarding proprietary training, etc.)—and Ms. Collaros relied upon those representations as well.

186.     Ms. Collaros executed the contract for purchase of a diabetic alert dog for $25,000.00 on March 30, 2018.

187.     After that, all of her communications were with SDWR employees acting at Dan Warren's direction; most of those communications were simply to encourage Ms. Collaros to continue to make payments.

188.     To make payments, Ms. Collaros was directed to either have funds wired to a "Donor Drive," bank account, which was completely controlled by Dan Warren, or to mail checks directly to SDWR.

189.     Most of the payments were made electronically by wiring funds to Donor Drive's bank account in Ohio—funds which were then automatically transferred to bank accounts Dan Warren and Jacob Dudek controlled in Virginia at the close of each business day.

190.     Once the funds were in those bank accounts Warren and/or Dudek would (among other things) and from time to time:

     a.     Transfer the funds to Bordeaux Farms, LLC bank accounts or Warren's own personal bank accounts which Warren completely controlled.

     b.     Transfer the funds to Charitable Occasion, LLC's bank accounts which Warren completely controlled.

     c.     Transfer the funds to transfer it to their personal accounts.

     d.     Use the funds to pay for personal expenses.

     e.     Transfer the funds to Ms. Warren repay Ms. Warren for her investment in the fraud scheme  and/or use it to fund further fund their fraud scheme.

191.     In addition, Ms. Collaros mailed a final payment of $5,000.00 from her home in Ohio to Warren's Farm in Virginia in December 2018.

192.     She completed full payment of the purchase price in December 2018.

193.     Upon completing payment, she was told  it would be at least nine months before

she would receive a fully trained service dog because she would "get put in line" and because "the training takes time."

194.    In addition, at about this same time, SDWR employees acting at Dan Warren's direction reaffirmed Dan Warren's earlier statements that the service dog that the Collaros family would receive would be fully trained upon arrival.

195.    Ms. Collaros was told the service dog would be two years old because it had to go through a lot of training.

196.    After nine months had gone by, and having heard nothing about delivery of a service dog, Ms. Collaros followed up with SDWR.

197.    In October and November 2019, she had multiple conversations with one of the former head trainers, Erin Gray.

198.    In November 2019, Ms. Gray called Ms. Collaros to say that Dan Warren informed her that a dog, named "Ben" had been selected for Ms. Collaros.

199.    Ms. Gray sent a picture of Ben to Ms. Collaros and sent her a list of supplies.

200.    She told Ms. Collaros it would probably take a couple of months for a delivery date to be confirmed.

201.    Unfortunately, shortly after that, Ms. Gray went on medical leave and never returned to SDWR.

202.    Having again heard nothing by late January 2020, Ms. Collaros reached out to Dan Warren and others at SDWR to obtain a delivery date for "Ben."

203.    During multiple conversations and emails between January and February 2020, she was given many excuses for a delay on the delivery of "Ben," such as that they were having some "staffing issues."

204.     Still, on multiple occasions, employees acting specifically at Warren's or Dudek's direction and/or Warren/Dudek directly assured Ms. Collaros that "Ben" would be delivered in March 2020.

205.     However, in mid-March 2020, Ms. Collaros was told that all deliveries had been suspended due to the COVID-19 pandemic.

206.     A couple of weeks later, she received an email that she could pick up a dog in early April if she drove to the SDWR farm in Virginia; however, the dog promised to her in that email was named "Barkley."

207.     This immediately raised a red flag for Ms. Collaros, and she began to suspect she had been defrauded.

208.     To be sure, she followed up with additional questions about "Barkley," such as how long the dog had been trained, how "Barkley" had been trained to alert as promised—and, no one, including Dan Warren, could answer those questions.

209.     As a result, Ms. Collaros responded that she would not be coming to pick up a dog in April 2020 because she "paid $25,000.00 for a fully trained diabetic alert dog"—as a result of Dan Warren's misrepresentations—and "not just a dog."

210.     Shortly after that, through social media, Ms. Collaros first learned Warren, Dudek and their co-conspirators had not only scammed her, but had also scammed dozens if not hundreds of other families.

211.     Ms. Collaros never received a service dog, never had any reason to suspect Dan Warren or Dudek was defrauding her until March 2020, and never had any reason to suspect that SDWR was insolvent until June 2020 when she learned SDWR had filed for bankruptcy.

212.     At the time Dudek and Warren made all of the aforementioned representations to

Ms. Collaros, they had no intention of ever providing her with a fully trained service dog. They just wanted her money.

**COUNT ONE**
**Violation of 18 U.S.C. § 1962(c), the Racketeer Influenced and**
**Corrupt Organization Act, ("RICO")**
**(All Plaintiffs against all Defendants)**

213. Plaintiffs bring this Count against all Defendants.

214. Plaintiffs are natural persons, and as such are "persons" within the meaning of 18 U.S.C. § 1961(3).

215. Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3).

216. Defendants violated 18 U.S.C. § 1962(b) by participating in or conducting the affairs of the Dan Warren-Bordeaux Farms-Charitable Occasion-Dudek-Ms. Warren association-in-fact through a pattern of racketeering activity.

**The Warren RICO Enterprise**

217. The following persons, and others presently unknown, have been members of and constitute an "association-in-fact enterprise" within the meaning of RICO, and will be referred to herein collectively as the "Warren RICO Enterprise."

    a.     <u>Dan Warren</u>, who directed the actions of employees at SDWR to defraud the Plaintiffs; directly interacted with Plaintiffs, falsely represented the quality of service dogs he sold to Plaintiffs, and defrauded those consumers; engaged in self-dealing and funneled funds obtained by fraud and other unlawful means from the Plaintiffs (including all Plaintiffs) to Bordeaux Farms, Charitable Occasion, Ms. Warren, and other persons and entities unknown at this time; and received hundreds of thousands of dollars of cash and other valuable benefits from the Warren RICO Enterprise.

    b.     <u>Dudek</u>, who as an officer and Vice-President of SDWR, directed and/or ratified the actions of employees at SDWR to defraud the Plaintiffs; cared for and directed the delivery and sale of purported "service dogs" to the Plaintiffs; and received hundreds of thousands of dollars of cash and other valuable benefits from the Warren RICO Enterprise.

    c.     <u>Bordeaux Farms</u>, which is a single member LLC controlled by Dan

Warren—and which land that the Farm operated on—knowingly accepted hundreds of thousands of dollars from Dan Warren and SDWR disguised as "rent" payments, but which were actually less than arms-length transfers made at Dan Warren's direction to launder money unlawfully obtained from the Plaintiffs by the Warren RICO Enterprise. Bordeaux Farms subsequently transferred that money to Dan Warren, Ms. Warren, and others unknown at this time. Bordeaux Farms also used the laundered funds to pay Dan Warren's and Dudek's personal debts.

      d.    <u>Charitable Occasion</u>, which is a single member LLC controlled by Dan Warren—and which owns land that is adjacent to the land that the Farm operated on—knowingly accepted hundreds of thousands of dollars from Dan Warren in less than arms-length transfers to launder money unlawfully obtained from the Plaintiffs by the Warren RICO Enterprise. Charitable Occasion subsequently transferred that money to Dan Warren, Ms. Warren, and others unknown at this time. Charitable Occasion also used the laundered funds to pay Dan Warren's and Dudek's personal debts.

      e.    <u>Ms. Warren,</u> who is Dan Warren's mother, and who upon information and belief, knew Dan Warren was not operating a legitimate business, nonetheless knowingly provided financial support to the Warren RICO Enterprise in exchange for a profitable share of the illicit funds Dan Warren, Dudek, and the other Co-Conspirators unlawfully obtained from the Plaintiffs. Ms. Warren helped fund the Warren RICO enterprise by using the interstate and intrastate mails and wires on multiple occasions to pay off the mortgage on the Farm and subsequently directly fund Dan Warren's fraud scheme—as alleged herein throughout.

218. The Warren RICO Enterprise, which engages in and whose activities affect interstate commerce, is an association-in-fact of individuals and corporate entities within the meaning of 18 U.S.C. § 1961(4) and consists of "persons" associated together for a common purpose. The Warren RICO Enterprise has an ongoing organization with an ascertainable structure and functions as a continuing unit with separate roles and responsibilities, and is presently endeavoring to continue operations in another state—most likely Florida.

219. While Dan Warren, Dudek, Bordeaux Farms, Charitable Occasion, and Ms. Warren all have participated in and continue to participate in the conduct of the Warren RICO Enterprise, they have an existence separate and distinct from the Warren RICO Enterprise. Further, the Warren RICO Enterprise is separate and distinct from the pattern of racketeering in which Dan Warren, Dudek, Bordeaux Farms, Charitable Occasion, and Ms. Warren engage.

a.     At all relevant times, Dan Warren operated, controlled or managed the Warren RICO Enterprise, through various actions.  Dan Warren's participation in the Warren RICO Enterprise is and was necessary for the operation of the enterprise's scheme to defraud because (among other reasons), Dan Warren: directed the actions of his Co-conspirators to defraud the Plaintiffs; laundered funds unlawfully obtained from the Plaintiffs; executed contracts with the Plaintiffs as part of the scheme to defraud; directly solicited vulnerable families—including the Plaintiffs—whom he lied to about the quality, characteristics and abilities of the purported "service" dogs he agreed to supply them with and concealed the true quality, characteristics and abilities of those dogs; lied to the Plaintiffs about the dog training SDWR would provide to the families; falsely advertised or directed others to falsely advertise about the quality, characteristics, and abilities of the purported "service" dogs his company owned and could supply consumer with; and he has profited from his concealment and lies.

b.     At all relevant times, Dudek operated, and assisted in the control and management of the Warren RICO Enterprise, through various actions.   Dudek's participation in the Warren RICO Enterprise is and was necessary for the operation of the enterprise's scheme to defraud because (among other reasons), he: directed and/or ratified the actions of his Co-conspirators to defraud the Plaintiffs; laundered funds unlawfully obtained from the Plaintiffs; directly lied to consumers about the quality, characteristics and abilities of the purported "service" dogs that Dan Warren agreed to supply them with and helped Dan Warren conceal the true quality, characteristics and abilities of those dogs; lied to consumers and/or concealed from consumers about the dog training SDWR would provide to the families; falsely advertised or directed others to falsely advertise about the quality, characteristics, and abilities of the purported "service" dogs that the Plaintiffs would be supplied with; and he has profited from his concealment and lies.

c.     At all relevant times, Bordeaux Farms operated, and assisted in the control and management of the Warren RICO Enterprise, through various actions.   Bordeaux Farms' participation in the Warren RICO Enterprise is and was necessary for the operation of the enterprise's scheme to defraud because (among other reasons), it: laundered funds unlawfully obtained from the Plaintiffs and distributed those funds to Dan Warren, Dudek, Ms. Warren, and other unknown entities in furtherance of the conspiracy; and it directly profited from its actions.

d.     At all relevant times, Charitable Occasion operated, and assisted in the control and management of the Warren RICO Enterprise, through various actions. Charitable Occasion' participation in the Warren RICO Enterprise is and was necessary for the operation of the enterprise's scheme to defraud because (among other reasons), it: laundered funds unlawfully obtained from the Plaintiffs and distributed those funds to Dan Warren, Dudek, Ms. Warren, and other unknown entities in furtherance of the conspiracy; and it directly profited from its actions.

e.     At all relevant times, Ms. Warren operated, and assisted in the control and management of the Warren RICO Enterprise, through various actions.  Ms. Warren's participation in the Warren RICO Enterprise is and was necessary for the operation of the

enterprise's scheme to defraud because (among other reasons) she, knowing that the purpose of the enterprise was to defraud consumers, funded the Warren RICO Enterprise by paying off loans that Dan Warren and other Co-conspirators owed to third parties and providing funds to sustain Warren RICO Enterprise in exchange for a share of the laundered funds unlawfully obtained from the Plaintiffs (and others); and she has directly profited from her participation in the Warren RICO Enterprise's unlawful scheme to defraud consumers.

220. Dan Warren, Dudek, Bordeaux Farms, Charitable Occasion, and Ms. Warren, as members of the Warren RICO Enterprise, serve a common purpose to, among other things, preserve the collusive relationship between Dan Warren and his Co-conspirators, as described throughout this Complaint including, but not limited to Paragraphs 3-11, 17, 20, 46-56, 59-66, 68-75, 84-91, 94, 100-115, 132-145, 162-171, 181-191, and 217-219 of this Complaint.

221. Dan Warren, Dudek, Bordeaux Farms, Charitable Occasion, and Ms. Warren benefit from this common purpose by receiving, for example, the benefits described in Paragraphs 6, 8, 10-11, 16-18, 20, 44, 46-50, 52-55, 64, 73, 90, 94, 111-116, 143-144, 168-173, and 188-192 of this Complaint.

**Pattern of Racketeering Activity**

222. Dan Warren and his Co-conspirators conduct and participate in the conduct of the affairs of the Warren RICO Enterprise through a pattern of racketeering activity that has consisted of numerous and repeated violations of federal mail and wire fraud statutes, which prohibit the use of any interstate or foreign mail or wire facility for the purpose of executing a scheme to defraud, in violation of 18 U.S.C. §§ 1341 and 1343.

223. This scheme is detailed throughout this Complaint, including *inter alia* Paragraphs 3-20, 61, 66, 69, 75, 80, 91, 100, 103, 107, 110-115, 119, 131-136, 144, 146-149, 158-`59, 162, 165-166, 168-172, 179-183, 187-191, and 202-209.   For example, as alleged in Section III, VI-VIII, above each family involved in this lawsuit was duped by Warren and his Co-conspirators in

multiple written and oral communications over the interstate wires and mails, and were induced to send Warren and Dudek tens of thousands of dollars over the interstate wires and mails, which was eventually distributed to each of the co-conspirators either as a "rent" payment for the Farm, purported "salary," repayment (at a profit) for a loan, or to launder or hold in an undisclosed bank account.

224.     As detailed in the general factual allegations herein, Dan Warren and his Co-conspirators knew that the purported "service" dogs that Dan Warren and Dudek were advertising to vulnerable families, such as the Plaintiffs, as *therapy* dogs, were in reality not trained as service dogs, could not provide the *therapy* advertised, and were not worth the tens of thousands of dollars charged per dog, which Warren and his Co-conspirators subsequently and unlawfully pocketed.

225.     To further the scheme to defraud, Dan Warren and Dudek repeatedly misrepresented and concealed the true quality, characteristics and abilities of those "service" dogs; and lied to the Plaintiffs and/or concealed from the Plaintiffs about the dog training SDWR would provide them; falsely advertised or directed others to falsely advertise about the quality, characteristics, and abilities of the purported "service" dogs that the Plaintiffs would be supplied with.  In addition, to further the scheme to defraud, Bordeaux Farms and Charitable Occasion laundered hundreds of thousands of dollars obtained by Dan Warren and Dudek (and benefited from those funds), and Ms. Warren furthered the scheme to defraud by funding it, and also benefited from it by obtaining a profit on the amount of money she invested in the scheme.

226.     To carry out or attempt to carry out the scheme to defraud, Dan Warren, Dudek, Bordeaux Farms, Charitable Occasion, and Ms. Warren have conducted or participated in the conduct of the affairs of the Warren RICO Enterprise through a pattern of racketeering activity that employs the use of the mail and wire facilities, in violation of 18 U.S.C. § 1431 (mail fraud)

and § 1343 (wire fraud), including for example:

     a.    Dan Warren and Dudek devised a scheme—in furtherance of their collusive relationship with the other Co-conspirators—to defraud by use of the mail, telephone, television, and internet, or caused to be transmitted by means of amil and wire communications traveling in interstate or foreign commerce, writing(s) and/or signal(s), including the SDWR website[5], which includes, among other things: videos from purportedly "satisfied customers," statements regarding the quality of service dogs provided by Dan Warren and Dudek, the quality of the services provided by Dan Warren and Dudek, and other misleading statements and advertisements.

     b.    Dan Warren and Dudek have utilized the U.S. mail and wires for the purposes of obtaining money and property by the means of the omissions, false pretenses, and misrepresentations described herein, including, but not limited to obtaining money from the Plaintiffs outside the Commonwealth of Virginia via these means either directly or through third-parties (outside the Commonwealth of Virginia) and then transferring that money either directly to themselves or to the other Co-conspirators within the Commonwealth of Virginia, or to bank accounts located inside and outside of the Commonwealth of Virginia.

     c.    Bordeaux Farms, Charitable Occasion, and Ms. Warren have knowingly and willingly received the unlawfully obtained money described above via interstate wires or from bank accounts located outside the Commonwealth of Virginia several times over the last ten years.

227.    Dan Warren and the Co-conspirators' pattern of racketeering activity in violation of the mail and wire statutes includes, but is not limited to, the conduct alleged in this Complaint, such as for example, the conduct alleged at Paragraphs 61, 66, 69, 75, 80, 91, 100, 103, 107, 110-115, 119, 131-136, 144, 146-149, 158-`59, 162, 165-166, 168-172, 179-183, 187-191, and 202-209 of this Complaint.

228.    As alleged throughout this Complaint, Dan Warren and his Co-conspirators engaged in a pattern of related and continuous predicate acts and are likely to continue to do so. The predicate acts constituted and constitute numerous unlawful activities, each conducted with the common purpose of defrauding Plaintiffs (and others) and obtaining significant monies and

---

[5] http://www.sdwr.org

revenues from them. The predicate acts were related and not isolated events.

229. The predicate acts all had the purpose of generating significant revenue and profits for Dan Warren, Dudek, Bordeaux Farms, Charitable Occasion, and Ms. Warren. The predicate acts were committed or caused to be committed by Dan Warren, Dudek, Bordeaux Farms, Charitable Occasion, and Ms. Warren through their participation in the Warren RICO Enterprise and in furtherance of its fraudulent scheme, and were interrelated in that they involved the collusive relationship and common purposes described throughout this Complaint, and in particular (for example) the Introduction, and Sections IV and VI-VIII of this this Complaint.

230. By reason of and as a result of the conduct of Dan Warren, Dudek, Bordeaux Farms, Charitable Occasion, and Ms. Warren; and the pattern of racketeering activity alleged on behalf of the Warren RICO Enterprise, Plaintiffs have been injured in that they paid tens of thousands of dollars for purported "service" dogs that they never would have purchased had they known that the dogs could not provide the service/therapy advertised and (mis)represented to them.

231. Dan Warren's, Dudek's, Bordeaux Farms', Charitable Occasion's, and Ms. Warren's violations of 18 U.S.C. § 1962(c) have directly and proximately caused injuries and damages to Plaintiffs, and Plaintiffs are entitled to bring this action for **three times their actual damages, costs and reasonable attorney's fees,** and injunctive/equitable relief pursuant to 18 U.S.C. §§ 1964(a) and 1964(c).

### COUNT TWO
### Violation of 18 U.S.C. § 1962(d) of the RICO Act
### (All Plaintiffs against all Defendants)

232. All of the preceding Paragraphs are incorporated here, as if fully set forth herein.

233. Plaintiffs bring this count against all Defendants.

234. At all relevant times, Dan Warren, Dudek, Bordeaux Farms, Charitable Occasion,

and Ms. Warren have been and continue to be associated with the Warren RICO Enterprise and have agreed and conspired to violate 18 U.S.C. § 1962(c), that is, agreed to conduct and participate directly and indirectly in the conduct and affairs of the Warren RICO Enterprise, through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d).

235.    Dan Warren, Dudek, Bordeaux Farms, Charitable Occasion, and Ms. Warren knew that their predicate acts of wire fraud and/or mail fraud were a part of a pattern of racketeering activity and agreed to the commission of those acts to further their scheme to defraud the Plaintiffs.

236.    As a direct and proximate result of Dan Warren's and his Co-conspirator's conspiracy and the multiple overt acts taken in furtherance of their conspiracy, the Plaintiffs have been injured in their business and/or property (i.e., they paid tens of thousands of dollars for purported "service" dogs that they never would have purchased had they known that the dogs could not provide the service/therapy advertised and (mis)represented to them).

### COUNT THREE
### Virginia Common Law Civil Conspiracy
### (All Plaintiffs against all Defendants)

237.    All of the preceding Paragraphs are incorporated here, as if fully set forth herein.

238.    As alleged herein, Defendants conspired to defraud the Plaintiffs through the Warren RICO Enterprise.

239.    As alleged herein, Defendants formed the conspiracy to accomplish an unlawful purpose and/or use unlawful and tortious means in furtherance of the conspiracy.

240.    And, as a result, as alleged herein throughout, the Plaintiffs were each damaged by the Co-conspirator's actions.

241.    Accordingly, the Co-conspirator Defendants are jointly and severally liable to each of the Plaintiffs for those damages.

**COUNT FOUR**
**Violation of the Virginia Consumer Protection Act**
**Va. Code § 59.1-196 *et seq.* ("VCPA")**
**(All Plaintiffs against Defendants Dan Warren and Dudek Only)**

242.    All of the preceding Paragraphs are incorporated here, as if fully set forth herein.

243.    The VCPA applies to Warren's actions and Dudek's actions both directly and as officers of SDWR because a corporation can only act through its officers and agents, and in situations where a business (such as SDWR) is liable for unlawful conduct, so are all who participate.

244.    During all relevant times, SDWR, and Warren and Dudek—both individually and as officers of SDWR—were "supplier(s)" of "goods" or "services" in connection with "consumer transactions" as those terms are defined in Section 59.198 of the VCPA.

245.    Concerning "consumer transactions," the VCPA prohibits suppliers (such as Warren and Dudek) from:

      a.    Misrepresenting the source, sponsorship, approval, or certification of goods or services, pursuant to Virginia Code § 59.1-200(A)(2);

      b.    Misrepresenting the affiliation, connection, or association of the supplier, or of the goods or services, with another, pursuant to Virginia Code § 59.1-200(A)(3);

      c.    Misrepresenting that goods or services have certain quantities, characteristics, ingredients, uses, or benefits, pursuant to Virginia Code § 59.1-200(A)(5);

      d.    Misrepresenting that goods or services are of a particular standard, quality grade, style, or model, pursuant to Virginia Code § 59.1-200(A)(6);

      e.    Using any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction, pursuant to Virginia Code § 59.1-200(A)(14).

246.    During all relevant times, Warren individually, or together with Dudek and others, directed, controlled, approved, or participated in the unlawful actions—both individually or on behalf of SDWR—which are the subject of this lawsuit.

247.     Due to their active participation in those unlawful actions, Warren and Dudek should be held personally liable for all violations of the VCPA committed either individually or through SDWR.

248.     During all relevant times as stated in this lawsuit, Warren and Dudek violated the VCPA through the acts and practices described in this lawsuit, including, but not limited to:

      a.     Misrepresenting the skills and/or abilities of Diabetic Alert Dogs and Autism Alert Dogs (together "Service Dogs") as described in this lawsuit.

      b.     Misrepresenting the efficacy of Service Dogs as described in this lawsuit in violation of Virginia Code §§ 59.1-200(A)(6) and (14).

      c.     Misrepresenting the testing performed on, and the training provided to Service Dogs sold by SDWR, prior to their placement with consumers, in violation of Virginia Code §§ 59.1-200(A)(5), (6), and (14).

      d.     Misrepresenting the training and assistance that would be provided by SDWR trainers after placement of a Service Dog with the Plaintiffs, in violation of Virginia Code § 59.1-200(A)(14).

      e.     Misrepresenting how Plaintiffs could pay for a Service Dog and how long they would have to pay the balance due pursuant to a contract with SDWR—which Warren ratified—in violation of Virginia Code § 59.1-200(A)(14).

      f.     Misrepresenting what goods or services would be included in the cost of a Service Dog in violation of Virginia Code §§ 59.1-200(A)(5) and (14).

      g.     Misrepresenting the terms and conditions under which a Service Dog was provided, including but not limited to: (a) the existence of the written contract, and the terms contained therein; and (b) the limitations to or terms governing the performance guarantee, in violation of Virginia Code § 59.1-200(A)(14).

      h.     Misrepresenting that Plaintiffs were not entitled to refunds because SDWR is a non-profit organization and therefore cannot or does not give refunds, in violation of Virginia Code § 59.1-200(A)(14).

249.     Warren and Dudek willfully engaged in the acts and practices described in this lawsuit (or directed SDWR employees to engage in those acts and practices) in violation of the VCPA.

250. The Plaintiffs have suffered damages as a result of Warren's and Dudek's violations of the VCPA.

251. The VCPA provides treble damages and attorney fees and costs for willful violations of the VCPA pursuant to Va. Code § 59.1-204(A).

252. Accordingly, each of the Plaintiffs are entitled to an award of treble damages and their reasonable attorney fees and costs

## COUNT FIVE
### Common Law Breach of Contract
### (Defendants Dan Warren and Jacob Dudek-Warren Only)

253. All of the preceding Paragraphs are incorporated here, as if fully set forth herein.

254. Warren and Dudek promised Service Dogs to the Plaintiffs in exchange for the Plaintiffs paying tens of thousands of dollars for those dogs (collectively the "Plaintiffs' Contracts").

255. Warren, given his control of SDWR, and as the President of SDWR breached those contracts by failing to provide trained Service Dogs as bargained for by the Plaintiffs pursuant to contracts that he signed personally.

256. Dudek, as the Vice-President of SDWR, breached the Plaintiffs' Contracts by directly failing to provide trained Service Dogs as bargained for by the Plaintiffs or directing his employees to take action in breach of those contracts.

257. As a result, the Plaintiffs have sustained actual contractual damages and Warren is liable for those damages.

258. Warren, as President of the SDWR has individual liability for breach of contract as alleged herein.

259. Dudek, as Vice-President of SDWR has individually liability for breach of contract

as alleged herein.

## COUNT SIX
## Common Law Fraud
### (All Plaintiffs against Defendants Dan Warren and Jacob Dudek-Warren Only)

260.    All of the preceding Paragraphs are incorporated here, as if fully set forth herein.

261.    As alleged herein throughout, for example at Paragraphs 98-116, 131-145, 160-173, and 181-195 Warren made false representations of material fact to each of the Plaintiffs regarding the quality, availability, and training of the service dogs they were to receive.

262.    As alleged herein throughout, for example at Paragraphs 98-116, 131-145, 160-173, and 181-195 Warren made these misrepresentations knowingly and with the intent to mislead each of the Plaintiffs.

263.    As alleged herein throughout, for example at Paragraphs at Paragraphs 98-116, 131-145, 160-173, and 181-195, Dudek made false representations of material fact to each of the Plaintiffs regarding the quality, availability, and training of the service dogs they were to receive.

264.    As alleged herein throughout, for example at Paragraphs at Paragraphs 98-116, 131-145, 160-173, and 181-195, Dudek made these misrepresentations knowingly and with the intent to mislead each of the Plaintiffs.

265.    As alleged herein throughout, for example at Paragraphs at Paragraphs 98-116, 131-145, 160-173, and 181-195, each of the Plaintiffs reasonably relied on Warren's and Dudek's misrepresentations, and as a result each of the Plaintiffs was damaged, respectively, as follows:

a.    Kristin Borg paid $25,450.00 for an autism therapy dog for her 9-year-old son and never received any such dog.  Warren and Dudek have refused to refund that money.  In addition, she has suffered emotional distress associated with having been promised that dog would be provided to her family.

b.    Katherine Collaros paid $25,000.00 for a diabetic alert dog for her 14-year-old child and never received any such dog.  Warren and Dudek have refused to refund that money.

c.	John Denning paid $16,000.00 toward receiving a diabetic alert dog and never received any such dog. Warren and Dudek have refused to refund that money.

d.	Jeannie Rich paid $25,000.00 for an autism therapy dog for her 11-year-old child. Warren and Dudek have refused to refund that money. In addition, she has suffered emotional distress associated with having been promised that dog would be provided to her family.

266.	Accordingly, the Plaintiffs are entitled to their actual damages incurred as a result of Dudek's and Warren's fraudulent misrepresentations and punitive damages to be determined by a jury.

**COUNT SEVEN**
**Common Law Unjust Enrichment**
**(All Plaintiffs against all Defendants)**

267.	All of the preceding Paragraphs are incorporated here, as if fully set forth herein.

268.	Each of the Plaintiffs individually conferred a benefit on each of the Co-Co-conspirator Defendants as alleged herein.

269.	As alleged throughout herein, each of the Co-conspirator Defendants knew of the benefit at the time they received it and knew the Plaintiffs expected to receive something of value in exchange for conferring that benefit (i.e., a fully trained service dog).

270.	As alleged herein, each of the Co-conspirator Defendants have retained all or a portion of the benefit conferred (i.e. cash) without providing anything of value in return.

271.	It would be inequitable for any of the Co-Conspirator Defendants to retain the money they have unjustly received.

272.	Accordingly, each of the Co-conspirator Defendants in jointly and severally liable to each of the Plaintiffs in the amount of actual cash payments the Plaintiffs paid, expecting a service dog in return.

## COUNT EIGHT
### Violation of the Florida Deceptive and Unfair Trade Practices Act
### Fla. Stat. § 501.201 *et seq.* ("FDUTPA")
### (Plaintiff Borg against Defendants Dan Warren and Dudek Only)

273.     All of the preceding Paragraphs are incorporated here, as if fully set forth herein.

274.     Under Virginia's choice-of-law statute, which is applicable to these proceedings, Florida law is applicable to all allegations by Mrs. Borg alleged in this Complaint.

275.     Accordingly, among other claims, the FDUTPA applies to Mrs. Borg's claims.

276.     Under the FDUTPA, Mrs. Borg is a "consumer" as defined by Fla. Stat. § 501.203.

277.     The FDUTPA applies to Warren's actions and Dudek's actions both directly and as officers of SDWR because a corporation can only act through its officers and agents, and in situations where a business (such as SDWR) is liable for unlawful conduct, so are all who participate.

278.     Defendants Warren and Dudek both directly and indirectly as alleged herein, advertised, offered and sold purported a "fully trained service dog" to Mrs. Borg, which directly affected commerce in Florida, where Mrs. Borg resides.

279.     Warren and Dudek engaged in unconscionable, unfair, and deceptive acts and practices in the conduct of trade and commerce in violation of Fla. Stat. § 501.204(1), including:

      a.     Misrepresenting the source, sponsorship, approval, or certification of goods or services.

      b.     Misrepresenting the affiliation, connection, or association of the supplier, or of the goods or services.

      c.     Misrepresenting that goods or services have certain quantities, characteristics, ingredients, uses, or benefits.

      d.     Misrepresenting that goods or services are of a particular standard, quality grade, style, or type.

e. Using any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction to obtain a consumer's funds.

f. Omitting, suppressing, and concealing the material fact that they never intended to provide a fully trained autism therapy dog to Borg or any training.

280. During all relevant times, Warren individually, or together with Dudek and others, directed, controlled, approved, or participated in the unlawful actions, which are the subject of this lawsuit—both individually and/or on behalf of SDWR.

281. Due to their active participation in those unlawful actions, Warren and Dudek should be held personally liable for all violations of the FDUTPA committed either individually or at their direction through SDWR.

282. During all relevant times as stated in this lawsuit, Warren and Dudek violated the FDUTPA through the acts and practices described in this lawsuit, including, but not limited to:

a. Misrepresenting the skills and/or abilities of Service Dogs as described in this lawsuit.

b. Misrepresenting the efficacy of Service Dogs as described in this lawsuit.

c. Misrepresenting the testing performed on, and the training provided to Service Dogs sold by SDWR, prior to their placement with consumers.

d. Misrepresenting the training and assistance that would be provided by SDWR trainers after placement of a Service Dog with the Plaintiffs.

e. Misrepresenting how consumers could pay for a Service Dog and how long they would have to pay the balance due pursuant to a contract with SDWR—which Warren ratified.

f. Misrepresenting what goods or services would be included in the cost of a Service Dog.

g. Misrepresenting the terms and conditions under which a Service Dog was provided, including but not limited to: (a) the existence of the written contract, and the terms contained therein; and (b) the limitations to or terms governing the performance guarantee.

h.    Misrepresenting that consumers were not entitled to refunds because SDWR is a non-profit organization and therefore cannot or does not give refunds.

283.    Warren and Dudek willfully engaged in the acts and practices described in this lawsuit (or directed SDWR employees to engage in those acts and practices) in violation of the FDUTPA.

284.    Warren's and Dudek's misrepresentations and omissions were material because they were likely to deceive Mrs. Borg about the Service Dog and other services she was supposedly to receive.

285.    Had Warren and Dudek disclosed to Mrs. Borg that she would not have received a fully trained Service Dog and subsequent training—among other things as alleged herein—Mrs. Borg would not have purchased a Service Dog.  Thus, Mrs. Borg acted reasonably in relying on Warren's and/or Dudek's misrepresentations and omissions, the truth of which they could not have discovered prior to SDWR's bankruptcy filing.

286.    Mrs. Borg has suffered damages as a result of Warren's  and Dudek's violations of the FDUTPA, as alleged herein throughout.

287.    The FDUTPA provides for declaratory and injunctive relief, per-violation statutory damages of up to $10,000.00, per violations and attorney fees and costs.

288.    Accordingly, under the FDUTPA, Mrs. Borg is entitled to an award of statutory damages, actual damages, declaratory and injunctive relief and her and her reasonable attorney fees and costs.

**COUNT NINE**
**Violation of California's Unfair Competition Law**
**Cal. Bus. And Prof. Code § 17200 *et seq.*  ("UCL")**
**(Plaintiff Rich against Defendants Dan Warren and Dudek Only)**

289.    All of the preceding Paragraphs are incorporated here, as if fully set forth herein.

290. Under Virginia's choice-of-law statute, which is applicable to these proceedings, Florida law is applicable to all allegations by Ms. Rich alleged in this Complaint.

291. Accordingly, among other claims, the UCL applies to Ms. Rich's claims.

292. The UCL applies to Warren's actions and Dudek's actions both directly and as officers of SDWR because a corporation can only act through its officers and agents, and in situations where a business (such as SDWR) is liable for unlawful conduct, so are all who participate.

293. Defendants Warren and Dudek have engaged both directly and indirectly in unlawful business practices in violation of the UCL, and have injured Ms. Rich in her money and property in doing so.

294. For example, as alleged throughout this Complaint, Dudek and Warren both directly and indirectly as alleged herein, devised and executed a fraud scheme and advertised, offered and sold a purported "fully trained service dog" to Ms. Rich as a part of a multi-year fraudulent scheme targeting Ms. Rich and other consumers as alleged herein throughout and in particular in Counts One and Two of this Complaint.

295. As a part of this fraudulent scheme, Warren and Dudek engaged in unconscionable, unfair, and deceptive acts in violation of the UCL, such as:

  a. Misrepresenting the source, sponsorship, approval, or certification of goods or services.

  b. Misrepresenting the affiliation, connection, or association of the supplier, or of the goods or services.

  c. Misrepresenting that goods or services have certain quantities, characteristics, ingredients, uses, or benefits.

  d. Misrepresenting that goods or services are of a particular standard, quality grade, style, or type.

e. Using any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction to obtain a consumer's funds.

f. Omitting, suppressing, and concealing the material fact that they never intended to provide a fully trained autism therapy dog to Borg or any training.

296. During all relevant times, Warren individually, or together with Dudek and others, directed, controlled, approved, or participated in the unlawful actions, which are the subject of this lawsuit—both individually and/or on behalf of SDWR.

297. Due to their active participation in those unlawful actions, Warren and Dudek should be held personally liable for all violations of the UCL committed either individually or at their direction through SDWR.

298. During all relevant times as stated in this lawsuit, Warren and Dudek violated the UCL through the acts and practices described in this lawsuit, including, but not limited to:

a. Misrepresenting the skills and/or abilities of Service Dogs as described in this lawsuit.

b. Misrepresenting the efficacy of Service Dogs as described in this lawsuit.

c. Misrepresenting the testing performed on, and the training provided to Service Dogs sold by SDWR, prior to their placement with consumers.

d. Misrepresenting the training and assistance that would be provided by SDWR trainers after placement of a Service Dog with the Plaintiffs.

e. Misrepresenting how consumers could pay for a Service Dog and how long they would have to pay the balance due pursuant to a contract with SDWR—which Warren ratified.

f. Misrepresenting what goods or services would be included in the cost of a Service Dog.

g. Misrepresenting the terms and conditions under which a Service Dog was provided, including but not limited to: (a) the existence of the written contract, and the terms contained therein; and (b) the limitations to or terms governing the performance guarantee.

h.    Misrepresenting that consumers were not entitled to refunds because SDWR is a non-profit organization and therefore cannot or does not give refunds.

299.    Warren's and Dudek's misrepresentations and omissions were material because they were likely to deceive Ms. Rich about the Service Dog and other services she was supposedly going to receive.

300.    Had Warren and Dudek disclosed to Mrs. Borg that she would not have received a fully trained Service Dog and subsequent training—among other things as alleged herein—Ms. Rich would not have purchased a Service Dog.  Thus, Ms. Borg acted reasonably in relying on Warren's and/or Dudek's misrepresentations and omissions, the truth of which they could not have discovered prior to SDWR's bankruptcy filing.

301.    Warren's and Dudek's unlawful business practices have directly and proximately harmed Ms. Rich as alleged herein, throughout, and for example at Paragraphs 125-153.

302.    The fraudulently-induced expenditure by Ms. Rich of $25,000.00 for a Service Dog that Dudek and Warren never had any intention of providing was a direct injury to Ms. Rich, in her money and property, at the moment it occurred.  And this injury was directly and proximately caused by Warren's and Dudek's unlawful business practices in violation of the UCL.

303.    At the same time, Warren and Dudek directly profited from the fraudulently-induced $25,000.00 payment as alleged herein throughout.

304.    Accordingly, under the UCL Ms. Rich is entitled to an award of declaratory and injunctive relief—including restitution and/or disgorgement of Warren's and Dudek's ill-gotten gains—to remedy the effect of their unlawful business practices; actually damages; any other damages available under the UCL; and her attorney fees and costs to be determined by the Court.

## COUNT TEN
### Violation of the North Dakota Deceptive Trade Practice Law
### N.D.C.C. § 51-10-01 *et seq.* ("NDUTPL")
### (Plaintiff Denning against Defendants Dan Warren and Dudek Only)

305.   All of the preceding Paragraphs are incorporated here, as if fully set forth herein.

306.   Under Virginia's choice-of-law statute, which is applicable to these proceedings, North Dakota's law is applicable to all allegations pertaining to Mr. Denning alleged in this Complaint.

307.   Accordingly, among other claims, the NDUTPL applies to Denning's claims.

308.   The NDUTPL applies to Warren's actions and Dudek's actions both directly and as officers of SDWR because a corporation can only act through its officers and agents, and in situations where a business (such as SDWR) is liable for unlawful conduct, so are all who participate.

309.   Defendants Warren and Dudek both directly and indirectly as alleged herein, advertised, offered and sold a purported "fully trained service dog" to Mr. Denning.

310.   Warren and Dudek engaged in unconscionable, unfair, and deceptive acts and practices in the conduct of trade and commerce in violation of the NDUTPL, including:

   a.   Misrepresenting the source, sponsorship, approval, or certification of goods or services.

   b.   Misrepresenting the affiliation, connection, or association of the supplier, or of the goods or services.

   c.   Misrepresenting that goods or services have certain quantities, characteristics, ingredients, uses, or benefits.

   d.   Misrepresenting that goods or services are of a particular standard, quality grade, style, or type.

   e.   Using any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction to obtain a consumer's funds.

f. Omitting, suppressing, and concealing the material fact that they never intended to provide a fully trained diabetic alert dog to Denning and/or any training.

311. During all relevant times, Warren individually, or together with Dudek and others, directed, controlled, approved, or participated in the unlawful actions, which are the subject of this lawsuit—both individually and/or on behalf of SDWR.

312. Due to their active participation in those unlawful actions, Warren and Dudek should be held personally liable for all violations of the NDUTPL committed either individually or at their direction through SDWR.

313. During all relevant times as stated in this lawsuit, Warren and Dudek violated the NDUTPL through the acts and practices described in this lawsuit, including, but not limited to:

a. Misrepresenting the skills and/or abilities of Service Dogs as described in this lawsuit.

b. Misrepresenting the efficacy of Service Dogs as described in this lawsuit.

c. Misrepresenting the testing performed on, and the training provided to Service Dogs sold by SDWR, prior to their placement with consumers.

d. Misrepresenting the training and assistance that would be provided by SDWR trainers after placement of a Service Dog with the Plaintiffs.

e. Misrepresenting how consumers could pay for a Service Dog and how long they would have to pay the balance due pursuant to a contract with SDWR—which Warren ratified.

f. Misrepresenting what goods or services would be included in the cost of a Service Dog.

g. Misrepresenting the terms and conditions under which a Service Dog was provided, including but not limited to: (a) the existence of the written contract, and the terms contained therein; and (b) the limitations to or terms governing the performance guarantee.

h. Misrepresenting that consumers were not entitled to refunds because SDWR is a non-profit organization and therefore cannot or does not give refunds.

314. Warren and Dudek willfully engaged in the acts and practices described in this

lawsuit (or directed SDWR employees to engage in those acts and practices) in violation of the NDUTPL.

315.    Warren's and Dudek's misrepresentations and omissions were material because they were likely to deceive Denning about the Service Dog and other services she was supposedly to receive.

316.    Had Warren and Dudek disclosed to Denning that he would not have received a fully trained Service Dog and subsequent training—among other things as alleged herein—Denning would not have purchased a Service Dog.  Thus, Denning acted reasonably in relying on Warren's and/or Dudek's misrepresentations and omissions, the truth of which they could not have discovered prior to SDWR's bankruptcy filing.

317.    Mr. Denning has suffered damages as a result of Warren's  and Dudek's violations of the NDUTPL, as alleged herein throughout.

318.    The NDUTPL provides for declaratory and injunctive relief, per-violation statutory damages of up to $5,000.00, per violations and attorney fees and costs.

319.    Accordingly, under the NDUTPL, Mr. Denning is entitled to an award of statutory damages, actual damages, declaratory and injunctive relief and his reasonable attorney fees and costs.

### COUNT ELEVEN
**Violation of the Ohio Consumer Sales Practices Act**
**O.R.C. § 1345.01 *et seq.* & O.A.C 109:4-3-01 *et seq.*  ("OCSPA")**
**(Plaintiff Collaros against Defendants Dan Warren and Dudek Only)**

320.    All of the preceding Paragraphs are incorporated here, as if fully set forth herein.

321.    Under Virginia's choice-of-law statute, which is applicable to these proceedings, Ohio law is applicable to allegations pertaining to Ms. Collaros as alleged in this Complaint.

322.    Accordingly, among other claims, the OCSPA applies to Ms. Collaros' claims.

323.     The OCSPA applies to Warren's actions and Dudek's actions both directly and as officers of SDWR because a corporation can only act through its officers and agents, and in situations where a business (such as SDWR) is liable for unlawful conduct, so are all who participate.

324.     Defendants Warren and Dudek both directly and indirectly, as alleged herein, advertised, offered and sold a purported "fully trained service dog" to Ms. Collaros.

325.     Warren and Dudek engaged in unfair and deceptive acts and practices in violation of O.R.C. 1345.02(B)(1)  by engaging in the following regarding a consumer transaction with Collaros:

     a.     Misrepresenting the source, sponsorship, approval, or certification of goods or services.

     b.      Misrepresenting the affiliation, connection, or association of the supplier, or of the goods or services.

     c.     Misrepresenting that goods or services have certain quantities, characteristics, ingredients, uses, or benefits.

     d.     Misrepresenting that goods or services are of a particular standard, quality grade, style, or type.

     e.     Using any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction to obtain a consumer's funds.

     f.     Omitting, suppressing, and concealing the material fact that they never intended to provide a fully trained diabetic alert dog to Denning and/or any training.

326.     During all relevant times as stated in this lawsuit, Warren and Dudek engaged in unconscionable acts and practices in violation of O.R.C. 1345.03(B)(2) by knowing at the time the consumer transaction with Collaros took place that the price of the purported Service Dog was substantially in excess of the price at which similar property or services were readily obtainable in similar consumer transactions by like consumers.

327. During all relevant times as stated in this lawsuit, Warren and Dudek engaged in unconscionable acts and practices in violation of O.R.C. 1345.03(B)(3) and (B)(6)-(7) through the acts and practices described in this lawsuit, including, but not limited to:

    a. Misrepresenting the skills and/or abilities of Service Dogs as described in this lawsuit.

    b. Misrepresenting the efficacy of Service Dogs as described in this lawsuit.

    c. Misrepresenting the testing performed on, and the training provided to Service Dogs sold by SDWR, prior to their placement with consumers.

    d. Misrepresenting the training and assistance that would be provided by SDWR trainers after placement of a Service Dog with the Plaintiffs.

    e. Misrepresenting how consumers could pay for a Service Dog and how long they would have to pay the balance due pursuant to a contract with SDWR—which Warren ratified.

    f. Misrepresenting what goods or services would be included in the cost of a Service Dog.

    g. Misrepresenting the terms and conditions under which a Service Dog was provided, including but not limited to: (a) the existence of the written contract, and the terms contained therein; and (b) the limitations to or terms governing the performance guarantee.

    h. Misrepresenting that Collaros was not entitled to refunds because SDWR is a non-profit organization and therefore cannot or does not give refunds, and refusing to give a refund.

328. Warren and Dudek engaged in the acts and practices described in this lawsuit (or directed SDWR employees to engage in those acts and practices) in violation of the OCSPA.

329. During all relevant times, Warren individually, or together with Dudek and others, directed, controlled, approved, or participated in the unlawful actions, which are the subject of this lawsuit—both individually and/or on behalf of SDWR.

330. Due to their active participation in those unlawful actions, Warren and Dudek should be held personally liable for all violations of the OCSPA committed either individually or

at their direction through SDWR.

331.     Had Warren and Dudek disclosed to Ms. Collaros that she would not have received a fully trained Service Dog and subsequent training—among other things as alleged herein—Denning would not have purchased a Service Dog.  Thus, Ms. Collaros acted reasonably in relying on Warren's and/or Dudek's misrepresentations and omissions, the truth of which they could not have discovered prior to SDWR's bankruptcy filing.

332.     Ms. Collaros has suffered damages as a result of Warren's and Dudek's violations of the OCSPA, as alleged herein throughout.

333.     The OCSPA provides for declaratory and injunctive relief, per-violation statutory damages of up to $5,000.00, and attorney fees and costs.

334.     Accordingly, under the OCSPA, Ms. Collaros is entitled to an award of statutory damages, actual damages, declaratory and injunctive relief and his reasonable attorney fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully requests that the Court enter judgment in their favor and against Defendants in an amount to be proven at trial, but in any event no less than $250,000.00 per plaintiff (including actual damages, treble damages, statutory damage, and punitive damages); that the Court permanently enjoin Dudek and Warren from ever owning a service dog business, ever training, or ever selling service dogs, and that the Court award Plaintiffs their costs and reasonable attorney fees as permitted by RICO, the VCPA, the UCL, the FDUTPA the NDUTPL, and the OCSPA.

Dated: November 221, 2020

Respectfully submitted,

/s/ Andrew M. Williamson
Andrew M. Williamson (VSB No. 83366)
**A.WILLIAMSON, LLC**
12410 Milestone Center Drive
Suite 600
Germantown, MD 20876
Phone: 301-916-1560
Email: amw@awilliamson.law
*Counsel for Plaintiffs*

## JURY TRIAL DEMAND

Plaintiffs demand a jury trial on all issues so triable in this action.

/s/ Andrew M. Williamson